In the

# United States Court of Appeals

### For the Seventh Circuit

———————

No. 05-2222

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ALTWAN D. CROSS,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 04 CR 179—**Barbara B. Crabb**, *Chief Judge*.

———————

ARGUED SEPTEMBER 26, 2005—DECIDED NOVEMBER 23, 2005

———————

Before EASTERBROOK, RIPPLE and ROVNER, *Circuit Judges*.

RIPPLE, *Circuit Judge*. On January 27, 2005, Altwan Cross
pleaded guilty to one count of possession with intent to
distribute 500 grams or more of a substance containing
cocaine. *See* 21 U.S.C. § 841(a)(1). He was sentenced to 150
months in prison. *See id.* § 841(b)(1)(A)(ii). Mr. Cross now
challenges his sentence; he alleges that the district court
violated the *Ex Post Facto* Clause of the Constitution of the

United States by applying retroactively the remedial portion of *United States v. Booker*, 125 S. Ct. 738 (2005). He also contends that the district court erred in calculating the quantity of drugs for which he was liable at sentencing. Because Mr. Cross' *ex post facto* argument was considered and rejected in *United States v. Jamison*, 416 F.3d 538 (7th Cir. 2005), and because the district court did not plainly err in crediting sentencing hearing testimony that established the defendant's involvement in the distribution of more than five kilograms of cocaine, we affirm the judgment of the district court.

# I

## BACKGROUND

During August 2004, the Dane County Narcotics and Gang Task Force initiated an investigation into Mr. Cross' drug trafficking activities. A confidential informant had told investigators that he had been purchasing cocaine from Mr. Cross for many years. As part of the investigation, the police supervised four controlled purchases of cocaine from Mr. Cross by the informant and an undercover agent. These sales totaled approximately 150 grams and were made during August, September and October of 2004. On October 19, 2004, a search warrant was executed at Mr. Cross' residence. The police recovered $13,520 in U.S. currency and nine individually wrapped baggies of white powder, hidden in a nylon lunch bag. A digital scale and a bottle of Pro Scent—a liquid used to dilute, and therefore increase the quantity of, controlled substances—was also recovered. Mr. Cross was present at the scene and arrested, as was his girlfriend. The powder, which weighed a total of 1,083 grams, field-tested positive for the presence of cocaine. Mr.

Cross subsequently admitted that the cocaine was his and that the cash was proceeds from drug sales.

On October 28, 2004, a grand jury in the Western District of Wisconsin returned a one-count indictment charging Mr. Cross with possession of and intent to distribute 500 or more grams of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1). He pleaded guilty to this offense on January 27, 2005.

The sentencing hearing was held on April 22, 2005. The Government called two witnesses. First, Jerry McCoy, Jr., a former friend and drug colleague of Mr. Cross, testified. McCoy had been arrested in October 2004 for distribution of cocaine, *see id.* and sentenced to 27 years' imprisonment. He told the court that he had agreed to assist the Drug Enforcement Administration ("DEA"), including testifying against Mr. Cross, in the hope that his cooperation would warrant a downward departure.

McCoy testified that he had known Mr. Cross for between three and five years. During that time, he also met Liborio Prado-Morales, a local drug dealer. He later introduced this individual to Mr. Cross for the purpose of conducting drug transactions. The first such transaction, according to McCoy, occurred in the spring of 2004 and consisted of the purchase of one kilogram of cocaine by Mr. Cross from Prado-Morales. Over the course of the next few months, Mr. Cross and McCoy purchased cocaine from Prado-Morales four or five times. McCoy estimated that Mr. Cross bought one-half of a kilogram on one occasion, a full kilogram three or four times, and a kilogram-and-a-half once or twice. McCoy also verified that, after his own arrest, he placed a monitored call to Mr. Cross in which Mr. Cross expressed a desire to buy cocaine from Prado-Morales later that week.

The Government next called Detective Michael Montie of the Madison Police Department. He testified that the police had placed a tap and trace on McCoy's cell phone in February 2004, prior to his arrest. This monitoring revealed more than 650 phone calls over the course of five months between McCoy and Mr. Cross. A similar trace was also placed on Mr. Cross' phone; it revealed twenty-nine calls during the month of September 2004 and seventeen calls during October 2004 to Prado-Morales. A summary of the results of the tap and traces on the phones of McCoy and Mr. Cross was introduced into evidence.

The Government also introduced the written testimony of its confidential informant. Although the court noted that the informant's "credibility [was in] dispute" because of his former felony convictions, R.37 at 6, it credited the testimony as establishing that Mr. Cross had been selling cocaine "for years," including the sale of approximately 150 grams while under police surveillance in the late summer and fall of 2004, *id.* at 54-55.

In his closing statement, counsel for Mr. Cross argued that McCoy's testimony—the only evidence substantiating with any precision that Mr. Cross had possessed more than five kilograms of cocaine—was unreliable. He pointed out that McCoy had refused to answer a number of questions on cross-examination, including how many prior convictions were on his record; the nature and extent of his drug habit; how many times he had purchased cocaine from Prado-Morales; whether he had also purchased cocaine from his brother; and whether he had assisted another individual in filling out false financial statements.

The defense also argued that McCoy's testimony could not be trusted because of his intimate involvement in the drug trade and his criminal history, including allegedly assisting

another individual in filling out false financial forms. In support of this theory, the defense introduced the affidavit of Montrell Savage, which described Savage's troubled history with McCoy related to cocaine trafficking. Specifically, Savage recounted that, when he tried to break off his relationship with McCoy, he received threats and his cars were vandalized. Savage also opined that, based on his experiences, he did not believe McCoy to be a "truthful person." Def.'s Ex.2; *see also* R.37 at 29-30. Lastly, the defense argued that McCoy's testimony regarding the quantity of cocaine purchased on each visit to Prado-Morales was speculative: McCoy admitted that he did not remember exactly how much cocaine Mr. Cross had purchased, and that he could only estimate that, once or twice, he purchased one kilogram, a few times a half of a kilogram, and maybe once or twice a kilogram-and-a-half.

Although it recognized that "McCoy had some credibility problems," *id.* at 54, the district court credited the specifics of his testimony as it related to the quantity of cocaine purchased by Mr. Cross from Prado-Morales. In the court's view, McCoy's version of events was corroborated by other evidence in the case, including the testimony of the confidential informant, phone records from the tap and traces, cash and cocaine found in Mr. Cross' residence during the October 2004 search, Mr. Cross' prior arrests and the exorbitant lifestyle he led despite his negligible income reported on federal tax forms. The district judge concluded, "[i]t would be just ridiculous to close my eyes to the evidence in this case of Mr. Cross's long, significant involvement in the distribution of cocaine." *Id.* at 56.

The district court then calculated the advisory guidelines sentencing range:

> McCoy testified to five or six visits [to Prado-Morales]. If I take five visits, if I say that on three of those visits Mr. Cross bought a half a kilo, one visit he bought a kilo, one visit he bought a kilo and a half, all of which Mr. McCoy testified, that's four kilos. He had over a kilo that he doesn't even contest. That takes us up to five kilos.[1]

*Id.* Thus, as determined by the court, the total quantity of cocaine involved in Mr. Cross' course of drug dealing was over five kilograms; this amount warranted a base offense level of 32. Taking into account a three-point downward adjustment for acceptance of responsibility, Mr. Cross was assigned an adjusted offense level of 29. His previous record placed him in criminal history category of IV. Therefore, the guidelines recommended a sentence of between 121-151 months in prison. The district court then imposed a sentence of 150 months, which is at the higher end of this range.

---

[1] Absent McCoy's testimony, Mr. Cross would have been sentenced for possession of and intent to distribute only 500 grams of cocaine, which translates to a base offense level of 26. Once three points are subtracted for acceptance of responsibility, the adjusted offense level would have been 23 and the guidelines range 71-87 months. *See* Presentence Report at 6. In light of McCoy's testimony, the Presentence Report was amended to recommend a base offense level of 32, for the possession with intent to distribute approximately 6.2 kilograms of cocaine, with an advisory sentencing range of 168-210 months. The court accepted the base offense level recommended in the amended Presentence Report, but subtracted three points for acceptance of responsibility, resulting in a sentencing range of 121-151 months.

## II

## DISCUSSION

Before this court, Mr. Cross appeals his sentence. He submits that his sentence violates the *Ex Post Facto* Clause of the Constitution. He further contends that the district court's finding that the total amount of cocaine attributable to him was over five kilograms is clearly erroneous.

### A.  The *Ex Post Facto* Clause

Mr. Cross contends that his sentence violates the *Ex Post Facto* Clause of the Constitution. Specifically, he argues that the retroactive application of the remedial portion of the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738 (2005), which held that the Sentencing Guidelines are merely advisory and thus permits the district court to sentence a defendant on the basis of facts neither found by the jury nor stipulated to by the defendant, unconstitutionally exposes him to a longer maximum sentence.

This position, however, was considered and rejected in *United States v. Jamison*, 416 F.3d 538 (7th Cir. 2005). *Jamison* held that the remedial portion of the *Booker* opinion could be applied retroactively without constitutional difficulty because the defendant was given "fair warning" that distributing cocaine was punishable by "up to twenty years, as spelled out in the United States Code." *Id.* at 539. The doctrines of stare decisis and precedent counsel that we should not revisit this matter. Because Mr. Cross has offered no reason why *Jamison* does not control the outcome of this case, we cannot accept the contention that his sentence violates the *Ex Post Facto* Clause.

**B. Drug Quantity Calculations**

### 1. Standard of Review

Mr. Cross also contends that McCoy's testimony, relied on by the district court in sentencing Mr. Cross for possession of more than five kilograms of cocaine, is unreliable. We review a district court's calculation of the quantity of drugs involved in an offense—a factual determination—for clear error. *United States v. Souffront*, 338 F.3d 809, 832 (7th Cir. 2003). We shall reverse the determination of the district court only if, "after reviewing the entire record, we are left with the firm and definite conviction that a mistake has been made." *United States v. Brumfield*, 301 F.3d 724, 730 (7th Cir. 2002) (quotation marks omitted).

### 2. Discussion

Mr. Cross submits that the district court based its conclusion that he possessed and intended to distribute more than five kilograms of cocaine on unreliable evidence, namely the "incredible" testimony of McCoy. Appellant's Br. at 4. He emphasizes not only McCoy's history of drug abuse, drug dealing and criminal convictions, but also McCoy's unwillingness to answer a number of questions on cross-examination.

Although we give great deference to a district court's factual findings concerning drug quantity, we also must "be mindful of a defendant's due process right to be sentenced on the basis of reliable information." *Brumfield*, 301 F.3d at 732; *see also United States v. Garcia*, 66 F.3d 851, 856 (7th Cir. 1995). Because of this concern, "we have instructed district courts to scrutinize more carefully certain types of evidence offered at sentencing hearings." *Brumfield*, 301 F.3d at 732; *see also United States v. Beler*, 20 F.3d 1428, 1434-37 (7th Cir.

1994). However, so long as the evidence " 'bear[s] sufficient indicia of reliability to support [its] probable accuracy,' the court may consider [it] in sentencing." *United States v. Lanterman*, 76 F.3d 158, 161 (7th Cir. 1996) (citation omitted); *see also Brumfield,* 301 F.3d at 732 (holding that although the witness' testimony "contained some equivocations," it was not "so unreliable as to preclude the district court's considering it in calculating [the sentence]").

Even though McCoy's testimony contains ambiguities and is marked by his unwillingness to answer certain questions, we cannot conclude that these factors render the evidence so unreliable as to preclude the district court from considering it or even relying on it in calculating Mr. Cross' sentence.[2]

---

[2] Mr. Cross' situation is easily distinguishable from the circumstances in which we have determined that the evidence on which the district court relied at sentencing was untrustworthy. For example, in *Beler,* we held that the district had failed to conduct a "sufficiently searching inquiry into the government's evidence to ensure its probable accuracy." *United States v. Beler,* 20 F.3d 1428, 1433 (7th Cir. 1994). Not only did the court fail to probe inconsistences between the witness' two affidavits concerning drug quantity, *id.* ("[The witness] was never required to explain under oath the discrepancy between his two estimates."), but it also failed to consider a "crucial variance" between the witness' second affidavit and his testimony at trial, which rendered uncertain the defendant's "length of the course of dealing." *Id.* at 1434; *see also United States v. McEntire*, 153 F.3d 424, 437 (7th Cir. 1998) (holding that the evidence relied on by the district court was unreliable, given that it was "uncorroborated and the district court did not provide a rationale for believing one set of contradictory statements over another"). Here, by contrast, the district court carefully considered the deficiencies in McCoy's testimony,

(continued…)

To be sure, on cross-examination, McCoy refused to say how many times he had purchased cocaine from Prado-Morales; whether he also had purchased cocaine from his brother; whether he had used cocaine on a regular basis; and whether he had assisted another individual in filling out false financial statements. But, even assuming that these questions had been answered in the manner most favorable to the defense, thus establishing that McCoy was a frequent user of drugs and significantly involved in the drug trade,[3] the district court did not act unreasonably in relying on his testimony.

A witness' history of drug abuse does not necessarily render his testimony unreliable or unworthy of consideration. *See Brumfield*, 301 F.3d at 732. We note, moreover, that there is no evidence that the witness' memory was "impaired by 'a history of cocaine addiction.'" *United States v. McEntire*, 153 F.3d 424, 437 (7th Cir. 1998) (citation omitted). Nor is a witness' history of drug dealing a disqualifying factor. Especially when a defendant is charged with drug-

---

(…continued)
and credited that testimony despite defense counsel's objections, in light of the substantial evidence corroborating McCoy's account.

[3]   Mr. Cross does not argue that McCoy's refusal to answer these questions violated his constitutional rights, such as his Sixth Amendment right to confrontation. Instead, he argues that the unanswered questions prove the witness to be unreliable: specifically, that it makes it likely that McCoy was, in fact, a drug user and dealer. Thus, we proceed as if the witness answered the cross-examination questions in the manner most favorable to the defense, and nevertheless conclude that the district court did not err in crediting his testimony in the course of calculating Mr. Cross' sentence.

related activities, the court cannot "expect members of the cloth to testify about the intricacies of [the defendant's] drug dealing . . . operation." *United States v. 1948 S. Martin Luther King Dr.*, 270 F.3d 1102, 1113 (7th Cir. 2001) (holding that the district court did not err in finding that the "use of witnesses who are cooperating and have criminal histories is not unusual in this context") (quotation marks omitted); *see also McEntire*, 153 F.3d at 436 (noting that a district court may "credit testimony that 'is totally uncorroborated and comes from an admitted liar, convicted felon, large scale drug-dealing, paid government informant,'" so long as there is "'sufficient indicia of reliability'") (citations omitted); *Garcia*, 66 F.3d at 856-57 (witness' criminal background as a drug dealer "does not by itself establish unreliability").

Here, the testimony of McCoy is bolstered by evidence corroborating his version of events, including phone records evidencing contact between Mr. Cross and Prado-Morales, the money and drugs seized from Mr. Cross' home, his prior arrests for drug-related activity, and the confidential informant's testimony that he had been purchasing cocaine from Mr. Cross for years and that he was able to make controlled purchases from Mr. Cross in the fall of 2004 with "ease." R.37 at 54.

In light of this evidence, which gives McCoy's testimony sufficient indicia of reliability, we cannot say that the district court committed clear error in relying on McCoy's testimony. "Simply put, the district court had to make the type of routine credibility determination inherent in the fact-finding process." *Brumfield*, 301 F.3d at 733; *see also United States v. Torres-Ramirez,* 213 F.3d 978, 980-81 (7th Cir. 2000) ("When the sentence rests on testimony under oath . . . it is enough that the judge believe the witness—unless the testimony is illogical or contradicted by documents or other

physical evidence, making it clearly erroneous to accept the witness's version of events."); *United States v. Roe,* 210 F.3d 741, 749 (7th Cir. 2000) (holding that appellate courts shall not disturb a lower court's "credibility determinations," given that the lower court is "in the best position to observe, weigh, and evaluate a witness' verbal as well as nonverbal behavior") (citation omitted). After hearing McCoy's testimony, observing his demeanor, listening to defense arguments concerning the factors affecting McCoy's credibility and assessing the other evidence in the case, the district court was entitled to accept McCoy's version of the events and to sentence Mr. Cross for possession with intent to distribute more than five kilograms of cocaine.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*